IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| ROBERT M. FENLON #10115511 | § | |
| v. | § | CIVIL ACTION NO. 6:07cv532 |
| NATHANIEL QUARTERMAN, ET AL. | § | |

MEMORANDUM OPINION AND ORDER OF DISMISSAL

The Plaintiff Robert Fenlon, proceeding *pro se*, filed this civil rights action under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights.  The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment in this proceeding pursuant to 28 U.S.C. §636(c).  As Defendants, Fenlon sued Nathaniel Quarterman, Director of TDCJ-CID; the Chief Administrator of the University of Texas Medical Branch; medical providers employed by TDCJ; unknown employees and officers of TDCJ; and Lt. Baldwin, the law library supervisor at the Beto Unit.

An evidentiary hearing was conducted on February 12, 2008, pursuant to Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985).  At this hearing and in his complaint, Fenlon states that he had a lump on the side of his neck, and for years he was told that it was not cancer.  The lump appeared to respond to treatment by antibiotics; he states that it would "flare up" every six to eight months and was treated with amoxicillin, which would cause it to shrink.  He says that he repeatedly asked medical providers about the possibility of cancer and was always told that it could not be cancer because it was growing too slowly and because it responded to antibiotics.  However, it was been determined recently that the lump is in fact cancer, of a type known as squamous cell carcinoma.

Fenlon says that he was always told that he was being put on the list to go to Galveston for treatment, but that this did not happen.  He acknowledges that he did go to Galveston once, shortly after the lump was discovered, and saw a doctor very briefly, and the doctor seemed to think that the

1

lump was going away.  He says that he was surprised by how short the visit with the doctor was, after going all the way to Galveston, and the brevity of the visit also led him to believe that the lump was not something to be concerned about. In addition, Fenlon says, the fact that he was not sent again to Galveston led him to believe that the lump was not something for which he would be treated at the hospital in Galveston.

Since his cancer diagnosis, Fenlon says, he has been told by doctors in the hospital in Galveston that this cancer is a "secondary" cancer, and that it had to have come from some primary source, which cannot be located.  He has been told that this primary cancer may have been defeated by his body's immune system and died out, but that this is a "one-in-a-million chance." Fenlon acknowledges that CT scans of his head and body have been done, as well as X-rays, in an attempt to locate a primary cancer, but without success; however, when he asked for PET scans, he was told that these were not warranted.[1]

Fenlon complains that the doctors are "only telling him what they want him to know," which adds to his "anxiety and mental anguish."  He also says that he has not been able to review his medical records, and that when he picked up his file while waiting for an appointment in September of 2007, the officer with him made him put it down.

In June of 2007, Fenlon says, his tonsils removed, and the same type of cancer was found there.  He says that initial lab tests showed that this could not be the primary cancer, although later tests did not rule out the chance that it could be; however, he says, this apparently new cancer could not be the primary source for one which was five years old. He also has two other lumps, but has been told that these are not cancer.

Fenlon says that had the cancer been treated five years ago, or even six to eight months ago, he would have suffered less harm and damage.  In September of 2007, a doctor told him that he has a 60% chance of eradicating the cancer through radiation and chemotherapy.  Had the cancer been

---

[1]A PET scan, or positron emission tomography scan, measures bodily functions such as blood flow, oxygen use, and glucose metabolism to evaluate how well organs and tissues are functioning. *See* http://www.radiologyinfo.org/en/info.cfm?pg=PET&bhcp=1#part_one.

treated earlier, he says, his survival chances would have been higher, and the chemotherapy may not even have been necessary. In addition, Fenlon says, the surgery done on his neck was a radical neck disection, because the cancer had grown around his jugular vein. Had the cancer been treated earlier, he says that his jugular vein would not have needed removal and the surgery would have been simpler, requiring less cutting. The radiation and chemotherapy which he is undergoing causes a number of side effects, and there was damage to nerves connected to his tongue, causing difficulty in chewing as well as a speech impediment.[2]

Second, Fenlon says that in February of 2007, the lump in his neck became much larger. He submitted a sick call request and was seen by a physician's assistant at the Ramsey Unit on March 5, 2007. This P.A. was new to the Ramsey Unit and Fenlon had not seen her before. She expressed concern about the lump and said that Fenlon needed a biopsy, and that she was going to put him on the "very urgent" list for John Sealy hospital. Fenlon told her that he had been on that list for years. She also prescribed amoxicillin. He went to the hospital in Galveston in June and the cancer was diagnosed at that time.

Despite this, however, Fenlon says that the surgery was not performed until August of 2007, some six months later. He says that this six-month wait was unreasonable and represented deliberate indifference, and that the moving force or proximate cause of the delay was the policy and procedure of an underfunded system of providing medical care.

In his third claim, Fenlon says that more than three years ago, he noticed a "pulsing lump" in his stomach. He complained about this to medical providers at the Ramsey Unit, but they said that it was not abnormal and not a problem. In June of 2007 he had surgery to have his tonsils out, and the doctors noted the pulsing lump and determined that it was an abdominal aneurysm, which can be fatal if it bursts. He was scheduled for surgery, which was performed on August 7, 2007; he was supposed to have a follow-up two weeks later, but this did not happen until September 26, 2007.

---

[2]At the evidentiary hearing, Fenlon spoke articulately, with no observable sign of a speech impediment.

Fenlon then discusses the defendants he names in his lawsuit.  He says that the medical practice manager for the Beto Unit, Christina Moore, is sued regarding his medical claims.  Fenlon explains that when he arrived at the Beto Unit in March of 2007, he began submitting I-60 inmate request forms seeking treatment.  Most of these received replies; however, he says, after his cancer was diagnosed and the severity of his condition became known, the replies stopped.  He says that the failure to reply to his I-60s is "a blatant showing of deliberate indifference" and is also a federal crime when done after a civil rights lawsuit is filed.

Fenlon says that Cheryl Egan, a nurse at the Beto Unit, showed deliberate indifference to his medical needs when she refused to treat him on April 17, 2007, and would not provide amoxicillin or anything to try to reduce the swelling of the large lump on his throat.  He told her that he had been examined for this very problem on March 5 and had been put on the list for urgent transport to Galveston.

Fenlon says that he does not believe that the doctors and nurses in Galveston were deliberately indifferent; rather, he says that the moving force or proximate cause behind the delays in treatment were the policies and procedures of the overloaded and underfunded system of providing medical care.

The first four of Fenlon's enumerated claims (in his answer to the Magistrate Judge's Questionnaire dated October 12, 2007) concern the lump in his neck and the abdominal aneurysm.  His fifth claim concerns the dental care which he has received.  Fenlon says that he "has not pursued his legal remedies" with regard to this claim but that the facts are material to understanding his other claims.

In the facts of this claim, Fenlon says that he spent some 14 months in the Harris County Jail awaiting trial, and the county jail does not do tooth repair, only extractions.  When he arrived in TDCJ, he went to the Garza West Unit, where he was told that TDCJ did not do tooth repair for the first year.  Once he waited the year, he was told that he had to pass a "brush test" and have his teeth cleaned by a dental technician before repairs would be done.  It took another few months for the

4

brush test and cleaning to be done, and he finally got an appointment for tooth repair; however, Fenlon says, the repairs were not done to the teeth which were causing the problem.

When his second appointment for tooth repair came up, Fenlon says, he was more assertive in asking that certain back teeth be repaired, but the dentist refused, instead drilling out and refilling two good teeth in the front which were easier to reach.  Fenlon filed a grievance on this, but was transferred to the Ramsey Unit before he had a third appointment. At the Ramsey Unit, he filed a sick call request asking for tooth repairs, but was told that the waiting list for tooth repair took years. He says that he was never able to obtain any tooth repair while at the Ramsey Unit.

Since his arrival at the Beto Unit, Fenlon says, he has been seen by the dentist, whom he describes as "competent and genuine."  He says that the dentist promised to fix his teeth and said that none of his teeth were so bad as to require extraction.  However, Fenlon says, he has been unable to obtain appointments for tooth repair because he is always leaving on medical chains before the appointment can be kept.

According to Fenlon, one side effect of radiation therapy is a substantial increase in the likelihood of tooth decay, and the increased need to maintain his teeth.  He says that after one  day of radiation, three of his fillings fell out.  He told the medical staff conducting the radiation about this, and the doctor told him that he would document the complaint and the request that Fenlon's teeth be refilled, but that tooth repair would not be done while he was undergoing radiation.  Fenlon states that the doctor told him that this was "just policy" and that there was no medical reason why tooth repair could not be done while someone was receiving radiation.  He asks that the Court issue an injunction directing that his teeth be repaired.

Fenlon's sixth claim concerns denial of pain medication and other medication after surgery. He says that the primary defendant for this claim is Nathaniel Quarterman because the prison officials "appear to have been following TDCJ policy and procedures when failing to provide prescribed medication."

On June 25, 2007, Fenlon says, he had his tonsils removed.  The next day, he was awakened at 10:30 p.m. by security officers at the hospital in Galveston, and was taken to a holding cell and then to another cell.  He was moved back to a holding cell at 5:30 a.m.  Fenlon received no medications between 8 p.m. and 7 a.m., although he was supposed to be getting Tylenol 3 every four hours and amoxicillin every eight hours.  At 5:30 a.m., he asked three security officers and a nurse about this, but they told him that there were no provisions for medications at night for prisoners being held in this area.  Fenlon says that this was in the John Sealy prisoner unit, which is right downstairs from the hospital.

Fenlon concedes that he received medication at 7 a.m., 11 a.m., and 3:30 p.m. on June 27.  At 6 p.m., he was put on a bus and sent to the Byrd Unit, arriving at 10:30 p.m.  When he arrived, Fenlon says, he spoke to the intake nurse, who had a computer printout showing his prescriptions.  He told her that the last time he had received any medication was at 3:30 p.m., but she refused to give him any; Fenlon says that there were no provisions at the Byrd Unit for providing prisoners medication at night.  He did not get any medication until 5:30 the next morning.  The next day, a nurse made an exception for him and gave him medication at 8 p.m.; however, Fenlon says, on the day after that, he again did not receive any medications between 8 p.m. and 5 a.m.

On June 29, 2007, Fenlon says that he was transported to the Beto I Unit.  When he arrived, he was told that his prescription for Tylenol 3 had been reduced from every four hours to every six hours, by a doctor whom Fenlon had never seen.  On July 8, 2007, his prescription was reduced from 15 cc to 12.5 cc, and was then discontinued on July 12 instead of July 16 when it was supposed to have expired.  Fenlon also says that he did not get the Tylenol every six hours and that he was lucky if he got it three times a day.  In addition, Fenlon says, he was not being provided liquid amoxicillin, but rather was getting it in capsule form.  This also was not being provided every eight hours.  He says that he had an infection flare up on June 29, and that he was in a lot of pain.

After his second surgery, for the abdominal aneurysm, Fenlon says that all of his medication was stopped when he was removed from the hospital, because he had an IV in his arm which was

6

dispensing medication.  The IV was removed and he was put on a bus for a six-hour, high speed, rough ride to the Beto Unit.  Three days later, on August 14, he was put back on a bus for Galveston via the Byrd Unit; he says that it was a "100 degree heat wave without air conditioning." He had his next surgery on August 17, 2007. According to the discharge summary, he was supposed to receive acetaminophen with codeine (i.e. Tylenol 3), famotidine (i.e. Pepsid, a stomach acid reducer), and aspirin, but all he received was the aspirin.

After his third surgery, for his neck, Fenlon says that he was discharged from the hospital and sent to the Estelle Unit on August 21, 2007.  He received no medication for about 20 hours, and then got no Tylenol 3, no ranitidine (Zantac, another stomach acid reducer) and no Bactrim antibiotic, all of which had been prescribed.

Fenlon says that the failure to provide prescribed pain medication "turns medical treatment into a means of torture."  He says that the problem is TDCJ policy which provides that no one gets pain medication at night after surgery, because there is no provision for it to be dispensed.

In his seventh claim, Fenlon asserts that prison policies and procedures for providing and transporting prisoners to needed medical care amount to deliberate indifference and torture. He says that the method of transporting prisoners to and from John Sealy Hospital is substantially flawed. He states that prisoners are routinely denied pain medications and are bounced around in vehicles with "truck-like suspensions" and without air conditioning, which are driven at high speeds.  He says that prisoners in the transportation process are deprived of sleep, sometimes receiving only three to five hours of bunk time, they are denied clean clothing, and are routinely denied the opportunity to shower on the day that they are sent to or from the hospital. In addition, he says, prisoners are deprived of decent meals, receiving instead sack lunches containing sandwiches "of little nutritional value," they suffer delays in receiving their mail, and they cannot get access to a law library or to indigent supplies.

The centerpiece of Fenlon's lawsuit, as he made clear in the evidentiary hearing, is his contention that the proximate cause or moving force behind the delays in receiving medical care is

the policies and procedures of TDCJ and UTMB.  He says that these policies themselves are deliberately indifferent to prisoners' serious medical needs.  In this regard, Fenlon says that it is important to distinguish between the *written* policies and procedures, and the *actual* ones.  Fenlon acknowledges that the written policies and procedures are, on their face, legal and constitutional, but that the actual procedures, as well as the way that the written ones are interpreted, are unconstitutional.

For example, Fenlon says that by policy, inmates are allowed 20 minutes to eat from the time that they get their food.  However, the policy is interpreted to mean 20 minutes from the time they enter the dining hall.  This means that the time that inmates spend waiting in line, 10 minutes or more, is counted, giving them in effect seven or eight minutes to eat.

Fenlon also says that the buses used to transport inmates to and from the hospital have all had air conditioners installed.  These air conditioners are serviced at the beginning of the summer, which fact Fenlon calls a "nice-sounding official policy line."  However, he says, after they are serviced, the air conditioners work for about a week, and then quit, after which time they are not serviced again.  The result is that inmates are transported to Galveston all summer in buses in which the air conditioning does not work and which have poor air circulation.  The buses have sheet metal over the windows, which have holes allowing air flow if the bus is traveling over 20 or 30 miles per hour, but during the loading and unloading process, when the bus is stopped, the interior temperature can soar.

Fenlon says that the "nice sounding official policy line" says that the buses used to transport prisoners are suitable for the purpose and are similar to school buses.  In fact, he says, the buses were designed to be driven at a top speed of 50 to 55 miles per hour, and either have no shock absorbers or shocks which are not maintained.  He says that the buses are driven at high rates of speed, upwards of 80 miles per hour, and the ride is extremely rough.  He also says that the seats are too small for adult males and that if a person is handcuffed to a prisoner who is large or obese, he may get little or no seat on which to sit.  He says that riding the bus is "a torture."

Continuing his theme of challenging policies and procedures, Fenlon says that medical treatment in the prison has always been inadequate, and since TDCJ has come out from under federal supervision, there have been more cutbacks in funding.  He says that he has read newspaper articles in which TDCJ officials have been quoted as saying that reductions in the medical budget would result in an increase in legal actions and legal expenses defending lawsuits for inadequate medical care.  He says that Quarterman knew or should have known that he was approving funding reductions that were deliberately indifferent to the medical needs of prisoners, and that underfunding would result in medical care that was constitutionally inadequate.

Instead, Fenlon says, rather than appropriate funding and procedures to provide medical treatment, Quarterman has enacted policies, such as the transport policies, to discourage prisoners from seeking medical care.  In addition, Fenlon contends that Quarterman has "developed policies to attempt to set up defenses to suits by impeding administrative remedies and creating false or questionable records to support defenses that are actually frivolous."  He says that these mechanisms have been adopted to defeat legitimate prisoner suits rather than taking action to prevent the abuse of prisoners.

Fenlon says that it is "common knowledge" that qualified and caring doctors do not last long at TDCJ because they are "quickly disheartened."  For example, he says that TDCJ has a very limited list of medications that doctors can prescribe, which are usually those which have been around for a long time and are cheap.  He says that doctors are required to prescribe these to see if they work, even if the doctor knows that the medications will not work and that there are newer medications which can cure the patient.  Fenlon explains that what happens is that prisoners come in with infections or conditions which must be treated by medications on the approved list, but the doctor must try medications which are on the approved list which he knows will be inadequate.  Sometimes, he says, the doctor must prescribe several different medications, knowing that these will not work and knowing that there is a newer medication which would work, but that the doctor cannot prescribe this new medication because it is not on the approved list.  Eventually, the prisoner's condition

9

worsens to the point that he is sent to Galveston, where he does get the proper medication, but suffers permanent harm or disfigurement from the delay.  Once his condition gets under control, he is returned to TDCJ, but his prescriptions from Galveston are changed by doctors who never see him, putting him back on the approved medications or simply canceling his prescriptions altogether.

When prisoners attempt to file suit, Fenlon says, the prison officials respond with the list of medications which the doctor originally prescribed, in order to convince the court that while there may have been some negligence, it did not rise to the level of deliberate indifference.  He says that good doctors get frustrated and leave, and bad doctors get promoted.

In addition, Fenlon says, the backup and overload for medical care at the hospital in Galveston has passed the point to where it can be adequately managed.  He says that prisoners are often transported all the way to Galveston, only to find out that it was the wrong day and that their trip was for nothing.  Many appointments must be rescheduled because the prisoner was not transported by TDCJ.  He says that many inmates "fall through the cracks" and do not get treated for months or years, but concedes that on many days, TDCJ is transporting 200 or more inmates to Galveston for treatment.

He says that the doctors cannot keep up with the inmates who are no-shows, because they don't know if the prisoner has been released or has refused treatment, and so they, the doctors, "care for the prisoners who are present."  He says that after the initial delay which he suffered in getting treatment, he avoided some of these problems by asking the doctors to watch out for him, but even so, many appointments were missed or mixed up and had to be rescheduled.

The point, Fenlon says, is that rather than taking steps to diversify treatment away from the hospital in Galveston, TDCJ did the opposite by eliminating alternate routes for care and by providing care at the unit level which is more and more restricted.  He again avers that the system is constitutionally inadequate because the funding has been cut back for Galveston and the services cut back at the units, and eliminated alternatives to sending everyone to Galveston.  However, he

says, Galveston can only handle so much, and cannot treat prisoners who are not there because they have not been transported.

Fenlon says that TDCJ and UTMB are "the same entity," arguing that the complex contractual arrangement between them is designed to protect themselves from liability.   He complains that the policy of discharging prisoners from the hospital in Galveston is similar to discharge policies in free-world hospitals, but that when a person in the free world is discharged from the hospital, he is usually transported and cared for by loved ones who treat him gently and who give them their medications.  Prisoners, on the other hand, go on long, rough bus rides, which Fenlon says is in essence a beating, and get little or no prescribed pain medication.  He contends that hospital discharge policy is constitutionally required to take into account the environment into which the prisoner is being released.

Fenlon again asserts that when he first complained of the lump in his neck, all of the medical advice he received told him that it was not serious and was not cancer.  He concedes that the condition was very unusual in that it did not deteriorate for almost five years, and says that it is a miracle that he is still alive.  He says that it is "very often" that the medical treatment provided is so delayed that the prisoner suffers serious harm or disfigurement, and argues that the initial delays and inadequate care only make the subsequent costs greater; he says that it is "common sense" that "if the medical treatment for 150,000 prisoners is underfunded the prisoners are going to receive inadequate medical care."

In his eighth and ninth claims, Fenlon asserts that he has been denied access to court.  He says that he is appealing his conviction and that his case is "complex and unusual."  It has gone to the Fifth Circuit and he has attempted to file for Supreme Court review.  He says that by TDCJ policy, inmates are to be given ten hours per week in the law library, but that actual policy varies from unit to unit.  He says that when he first arrived in prison, he was able to spend 20 to 25 hours per week in the law library, but that this has been gradually restricted, and in recent years, apparently referring to the Ramsey Unit, he was only able to get about 15 hours per week.

11

However, Fenlon says, the situation has been very different at the Beto Unit.  He states that when he arrived at the Beto Unit in March of 2007, he submitted I-60 request forms to go to the law library, as per TDCJ procedure.  However, these submissions did not result in his obtaining adequate law library time.  When he attempted to resolve the problem informally, his attempt was met with "hostility, sarcasm, and deliberate indifference" by an officer named Ellige, with Lt. Baldwin looking on from her desk.  He has filed grievances, but the prison administration has turned a blind eye to the abuses.  He also complains that grievances which he has filed have disappeared.

As harm, Fenlon says that he was denied his right to submit his petition for certiorari to the U.S. Supreme Court because he could not comply with the rule requiring a copy of the district court's opinion, because Lt. Baldwin and TDCJ policy refused to give him access to the photocopy machine.  He says that this problem was compounded by the delays in his legal mail.  Fenlon says that the question of whether the Supreme Court clerk erred in not filing his petition when Fenlon showed that he could not comply with the rules makes this an issue for the federal district court.

Next, Fenlon says that there is no digest or directory for the federal circuit courts, and that only Fifth Circuit cases are listed in Texas Digest.  He says that it is important to research all parts of an action in all of the circuits because differences between circuits is one of the few criteria used by the Supreme Court in granting cert petitions.  There is no access to Shepardizing, and so Fenlon has to review all of the new federal reporters, federal supplements, and federal appendices when they come in.  He says that he has been denied "almost all access to the law library for the past six months" and that this has impeded his ability to litigate the present case as well as the appeal of his conviction.

As an example of a harmful policy, Fenlon says that court rules require a "certified copy" of an inmate trust account statement, but that TDCJ policy is to provide a "notarized copy."  The policy further provides that prison officials have up to 72 hours to respond to a request for notary services.  Thus, he says, prisoners cannot get a certified copy when they are ready to mail their complaint, but must wait up to three days for a notary to make himself available.

In another example, Fenlon says, when a prisoner is sent to Galveston, he generally spends one night at the Byrd Unit, or some other unit, while en route.  Although it is not possible to get mail during this brief stop, the prisoner's mail is forwarded to the Byrd Unit.  About a week later, it is sent to the prisoner's assigned unit.  If he happens to be there, he gets his mail, about two weeks late.  If he is not there, as for example if he is going back to Galveston, his mail gets forwarded again.

Fenlon says that TDCJ computers contain information about where prisoners are going and where they are going to be.  He says that the policy of forwarding mail to places where prisoners are, knowing that they are not going to be there, is "absurd."  He says that people in the free world can ask the post office to hold their mail, but that prisoners cannot do this.  He points to an instance in which Lt. Baldwin forwarded some mail to the Byrd Unit on June 5, and he, Fenlon, has yet to confirm whether he has received this mail or what it was.

With regard to his claim against Quarterman, Fenlon says that as director, Quarterman is the person who is "personally and officially responsible for TDCJ policies, procedures, training, and for the supervision of TDCJ staff."  He says that as a result, Quarterman is responsible in both his personal and official capacity when the policies themselves are a repudiation of constitutional rights and are the moving force behind a constitutional violation.  In addition, he says that Quarterman is the policy maker and supervisor who is responsible for policies and procedures which are enforced in such a manner as to turn a blind eye to prisoner complaints and grievances, as well as to the abuses of prisoners.

As evidence, Fenlon says that he received a letter from the Patient Liaison Program saying that the program no longer accepts complaints from prisoners.  He says that in fact, the program stopped accepting complaints from prisoners years ago, but on March 7, 2007, when he arrived at the Beto Unit, he received an information sheet advising prisoners that they could have a medical care matter reviewed by the program.  He says that this procedure serves to "frustrate and delay" prisoners in their attempts to resolve a problem by encouraging them to write to a program which will not accept their complaints.

One alternative which prisoners have, Fenlon says, is to send I-60 request forms.  He says that the forms themselves are often hard to get, but that a blank piece of paper may be used instead.  However, Fenlon says, officers "often do not bother" to reply to I-60's, and so it is not a procedure which is suitable for resolving complex problems.  The only remaining method for prisoners to communicate with officials is to file grievances, but Fenlon says that the grievance form allows only one page for a prisoner to set out his complaint.  Prisoners are only allowed one grievance every seven days, which Fenlon says is enforced in such a way as to make it difficult to submit three grievances a month.  In addition, he complains that grievances may only raise one issue and that prison officials often define the issue to which they choose to respond very narrowly, ignoring the actual thrust of the grievance.  He also says that most responses to grievances are "boilerplate, vague, and unresponsive."  As a result, Fenlon says that established policies and procedures regarding grievances and I-60's effectively turn a blind eye to prisoner complaints.

For relief, Fenlon says that his primary request is for declaratory and injunctive relief to obtain adequate and appropriate treatment for the cancer.  He also says that he seeks compensation for harm, pain, and suffering, as well as punitive damages against those persons found to be liable.

<u>Fenlon's Prison Records</u>

The Court has received and examined copies of Fenlon's prison records.  His medical records are far too extensive for a detailed examination, but show that Fenlon was seen on April 1, 2003, at the Ramsey I Unit, for what was described as a "soft tissue mass" in his neck.  The doctor noted that the mass softens and shrinks with antibiotic treatment and ordered tetracycline and Flagyl (metronidazole), both antibiotics.  On March 5, 2007, immediately before departing Ramsey I for the Beto Unit, he was seen by a physician named Dr. Ward, who found a "firm, non-mobile mass" on the left side of his neck, about 6 to 7 centimeters (between two and three inches).  She noted that Fenlon said that the mass had been there for five years and that it got larger and smaller, but was always there.  Dr. Ward prescribed antibiotics and a referral to the ear, nose, and throat clinic in Galveston. However, he was transferred to the Beto Unit two days later, on March 7.

After his arrival at the Beto Unit, Fenlon saw nurses on March 23, March 27, and April 4, with no mention of the lump on his neck.  On April 14, he saw Nurse Altstatt, who noted the lump and scheduled him for a follow-up appointment.

On April 17, 2007, Fenlon saw Cheryl Egan, the physician's assistant.  Egan's notes reflect that Fenlon told her that the lump had been present for more than a year, that he has been treated multiple times with antibiotics without resolution, and that the lump was secondary to a dental infection which the dental department refused to repair.  She ordered an expedited referral to Galveston, X-rays, and a complete blood count.  An FNA (fine-needle aspiration) was done on May 7, and on June 25, 2007, Fenlon was diagnosed with squamous cell cancer.[3]

He was scheduled for surgery to have the lump removed in August, but the surgery had to be postponed because of an abdominal aneurysm, which was discovered by a chest CT scan done in July.  The aneurysm was repaired on August 7, and the lump was removed on August 17, 2007.  Radiation and chemotherapy was started and has been continuing.  Fenlon is now housed in a medical facility.

Fenlon's dental records show that on January 27, 2003, he was seen in the dental clinic at the Ramsey Unit.  An oral cancer screening exam at that time was negative.  He had asymptomatic tooth defects in teeth no. 3, 8, 15, and 29, and was missing teeth no. 1, 5, 16, 17, 20 and 24.  No. 32 was impacted, although asymptomatic, and no. 3 had a piece of alloy and tooth fractured out.  A temporary filling material called Cavit was placed on tooth no. 3, but Fenlon was unhappy when told that there would be an extended waiting period for restorative treatment because of a DDS vacancy.

On May 24, 2006, he was seen in the dental clinic at the Ramsey Unit.  An exam was done and Fenlon was observed to have "very poor" oral hygiene, with moderate plaque, calculus (i.e. mineralized plaque) noted, and some decay.  An ulcer was seen on the side of his tongue, which the dentist said would resolve on its own in seven to 10 days.  No abscesses or swelling in his mouth

---

[1]Squamous cell carcinoma is the second most common form of skin cancer, arising in the squamous cells which compose most of the upper layer of the skin.

were noted.  The dentist suggested that Fenlon get a treatment plan started so that he could get his teeth cleaned and his decayed teeth taken care of, but Fenlon refused to have his teeth cleaned because of the pain.  It was explained to him that his mouth had to be cleaned before any fillings would be done, unless there was an emergency problem such as an extraction, but the dental notes reflect that Fenlon "became angry and left the clinic."  The last time he had seen the dentist before this visit had been in 2003.

There are several occasions where the dental records reflect that Fenlon did not show up for an appointment, with at least two of these indicating that he was on a chain to the hospital in Galveston.  However, since the filing of the lawsuit, the records indicate that Fenlon has been receiving dental treatment.  On November 7, 2007, he was seen by a dentist at the Young Medical Facility, who noted tooth decay (caries) with moderate calculus and bone loss.  X-rays and a follow-up exam were ordered, at priority 2.

The Court has also reviewed the grievances which Fenlon filed at the Beto Unit.  On March 28, 2007, he filed a grievance complaining about access to the law library, saying that he was scheduled to go from 12:30 to 3:30.  He says that this conflicts with the time that his wing has lunch and showers, and that it also conflicts with his scheduled work hours (although he concedes that he seldom or never is called out to work).  The response was that the law library schedule and rules are set up to accommodate the maximum number of inmates, that since Fenlon arrived at the Beto Unit he had been scheduled for seven law library sessions and had attended six of these, and that there is no indication of conflict because count generally starts at 1:00 and the second meal has been completed prior to count time.

In his Step Two appeal, Fenlon says that the response missed the point of his complaint, which concerned denial of law library access through unreasonable, unwritten, and irrational policies.  He says that if he misses shower to go to the law library, he will be subjected to disciplinary action, and that lunch often is not completed before the start of count at 1:00.  Inmates cannot sign into the law library after 1:00 p.m., but officers will not grant exceptions when lunch has

16

been delayed.  He also says that inmates must fill out I-60 request forms to use the law library, but that these are often sent back as filled out incorrectly, without instructions as to how to do it properly.  Finally, Fenlon complained that the grievance response said that he had attended six law library sessions in the eight weeks which he had been on the unit, which he states is a long way from the minimum ten hours per week that he is supposed to have.  The response to this grievance was that the Step One response adequately addressed his complaint, the unit schedule allows for "stuck-out showers" for inmates who miss the regular showers, the schedule also allows for different law library session times, and Fenlon may request a different time to attend the law library.

On April 12, 2007, Fenlon filed a grievance complaining that he is being denied medical care. He says that at breakfast that morning, the officers refused to give him his prescribed diet tray because an old kitchen list did not have his name on it.  He also complained that he began submitting I-60 requests when he arrived at the unit because he was not getting his medications or diet, but these were ignored.  The response was that Fenlon was on the Diet for Health diet list and that his medications are current.

Fenlon then filed a Step Two grievance complaining that the response shows that the grievance process is inadequate.  He complains about having to take a medication called doxazosin at 5:30 p.m. instead of bedtime even though it causes dizziness, and that the officer in the dining hall should be properly trained to recognize that the kitchen diet list was an old one.  The response was that the food service department had been contacted and Fenlon was on the Diet for Health list, and that his medication, including doxazosin, was now prescribed as "keep on person."

On April 20, 2007, Fenlon filed a grievance complaining about the lump on his neck.  He says that he was seen at the Ramsey Unit on March 5 and treatment was prescribed, but that he was sent to the Beto Unit two days later.  The treatment given at the Beto Unit was two pills per day instead of the three which had been ordered at Ramsey, and so the condition "subsided somewhat but soon returned."  He submitted a sick call request on Thursday, April 12, but was not able to see the nurse until two days later.  He was told that he needed to see a doctor but that none was available

17

until Tuesday.  On Tuesday morning he was taken to the medical department and saw a P.A., who told him that he needed to see a specialist at the ENT (ear, nose, and throat) clinic.  Fenlon says that the P.A. refused amoxicillin or pain medication, but acknowledges that she told him that he would go to Galveston within 30 days.  Fenlon complains that he has been told for years that he was on the list to see a specialist, and that some three years ago, he did go to the ENT clinic, where he was interviewed briefly and then returned to his unit.  The response was that he had been seen at sick call and referred to a medical provider, and that he is being followed by the ENT clinic in Galveston.

Fenlon filed a Step Two response complaining that the response did not address the issues he raised, including the delays in seeing a provider, the fact that he saw a P.A. rather than a physician, the fact that he was told that it would be another 30 days before he was seen in Galveston and that he had been waiting for years to do so, and that he has been submitting I-60's but to no avail. The response to this grievance was that on April 17, the provider ordered X-rays and bloodwork, which were done, and that he has radiology and ENT appointments in June.

On May 18, 2007, Fenlon filed a Step One grievance complaining that he was unable to get copies made and therefore could not file his cert petition with the U.S. Supreme Court.  He says that on March 2, his cert petition was returned to him with a letter from the court clerk directing him to attach a copy of the district court's decision.  He sent an I-60 request to the law library supervisor telling her of the problem, and got back a response saying "we do not make copies."  He hand-printed some copies of the court's opinion and sent these to the Supreme Court along with a letter explaining the circumstance.  On April 13, the Supreme Court rejected the petition for the same reason.  He submitted a second I-60, but the law library supervisor has not yet responded to this request.  Fenlon says that this policy deprived him of access to the Supreme Court, which is the primary issue of the grievance; he says that there is also a secondary issue, involving the slow delivery of mail.  Fenlon explains that the Supreme Court's letter of March 2 was delivered to him on March 19, and that the letter of April 13 was delivered to him on May 10, 2007.  He says that the issue of retaliation is a very complex one which cannot be addressed n the limited space allowed by

a grievance, but that the actions taken against him appear to be retaliatory in nature. The response to the grievance was that it was against policy to make copies for inmates, but that he can use the inmate copy service provided by the state law library.

Fenlon filed a Step Two grievance contending that the response sanctions a violation of his right of access to court. He says that the law requires that inmates be given a means of copying, which is why prisoners are issued carbon paper, but that one cannot produce copies of court orders with carbon paper. Consequently, he says that TDCJ is required by law to provide copy services when court rules require that copies be attached. He says that the inmate copy service does not provide free copies for indigent inmates such as himself. Fenlon also says that the response ignored his complaint about delays in the receipt of his legal mail, saying that his mail was sent off the unit for "irrational reasons" rather than being held there to await his arrival back from Galveston. The response was that the Step One answer had addressed his complaint and that indigent correspondence supplies are being provided in accordance with Access to Courts Policy 034 and Administrative Directive 07.90. Copies may be obtained in accordance with ATC 070 through the state law library and Fenlon's mail is being delivered in accordance with Board Policy 03.91.

On June 9, 2007, Fenlon filed another grievance about his mail. He says that on June 1, he sent an I-60 request to Lt. Baldwin, the law library supervisor, saying that he was going to be gone from the unit, leaving mid-week between June 4 and June 8. On or before June 4, some legal mail arrived for him at the Beto Unit, and Baldwin held the mail until after Fenlon had left the unit, and then forwarded it the Byrd Unit. Fenlon says that he should have been sent a pass on June 4 to come pick up his mail, but he was not. The response was that Baldwin did get legal mail for Fenlon on June 4 and he was chained out the next day; consequently, his mail was returned to the mailroom because the law library cannot hold it for him; there was no indication of staff misconduct.

In his Step Two appeal, Fenlon complains that the response said that there was no indication of staff misconduct, but that Baldwin did have his legal mail on June 4 and failed to deliver it, although she "knew" that he was to be chained out the next day. He says that policies and

19

procedures which result in the delay of legal mail over 30 days are "blatantly unreasonable and illegal," and asks that the "felony offense" be reported to the proper authorities and that his legal mail be located and sent to him.  He also complains that security officers rather than mailroom staff are handling his mail.  The response to this grievance was that the step One response had addressed his complaint and that mail is being handled and delivered in accordance with BP 03.91.

On June 28, 2007, Fenlon filed a Step One grievance complaining that he is being denied his prescribed pain medication, thus turning "medical treatment into torture."  He says that at 10:30 p.m. on June 26, he was awakened by security officers at the hospital in Galveston and told that he was being moved.  He was placed in a holding cell for about an hour and a half, and then to a regular cell. He was denied medication which was due at midnight and 4 a.m..  At 5:30 a.m. he was put in a holding cell, where he remained until 6 p.m., when he was put on a bus for the Byrd Unit.  He acknowledges that he received medication at 7 a.m., 11 a.m., and 3:30 p.m.  At the Byrd Unit, he was denied medication until 5:30 the next morning, and he received medication again at 11:30 and 3:30 p.m.  Fenlon says that "a very nice nurse" gave him his 8 p.m. medication, as well as some regular Tylenol for later since he would not get any more medication until the next morning.  He also complains of problems with the food and says that the Supreme Court has held that not permitting an inmate to get eight hours of sleep is cruel and unusual punishment, and the deprivation of sleep which he suffered during this time is cruel and unusual as well.  The response, from the warden of the Byrd Unit, says that Fenlon presented multiple issues in his grievance, most of which did not occur at the Byrd Unit, and that during Fenlon's overnight stay there, he received adequate medical care.

Fenlon filed a Step Two appeal saying that he did not raise multiple issues, but rather different aspects of the same issue.  He says that he is complaining of incidents at various places, not just the Byrd Unit, and that the response shows that the grievance procedure is a fraud.  He says that the Byrd Unit routinely denies inmates eight hours of sleep and that inmates arriving at Byrd from Galveston are routinely denied medications from the time that they arrive, normally between 9 and

11 p.m., and 3 a.m. the next morning.  He says that the unit staff "simply ignores" the fact that inmates would have been prescribed pain medication, and that the denial of such medication amounts to torture.  He again complains about the food which he received at the Byrd Unit, saying that he could not eat the sandwiches he received in the evening because he was on a liquid diet and could eat the crushed pineapple given for breakfast but was apparently not allowed to do so, receiving instead only "unpalatable liquids."   He complains that there is a policy of denying inmates medication at night and that this is also torture.  The response to this grievance says that Fenlon was interviewed by a grievance investigator about his complaint.  A review shows that he arrived at he Byrd Unit on June 27 and left the next day, and that one dose of medication was given on June 28. After he arrived at the Beto Unit, the prescribed medications - Tylenol 3 and amoxicillin - were ordered for him, but there was no indication that these were to be in liquid form.  The response acknowledges that there is no record of Fenlon receiving the amoxicillin from June 29 until July 6, but he was seen on July 3 for his complaint of not being able to take amoxicillin capsules; he was told that he had a choice between a shot of bicillin or the capsules, and he elected to take the capsules.  Tylenol 3 elixir was ordered for him at that time as well.  Since that time, Fenlon has been back to the hospital in Galveston for additional treatment, and so the response stated that his complaint was considered resolved.

On July 5, 2007, ten days prior to signing his complaint in this lawsuit, Fenlon filed a Step One grievance complaining in general about the medical treatment which he had received, and asking that "the highest level of care" be provided to overcome "five years of neglect."  The response to this grievance was that Fenlon had arrived at the Beto Unit in March of 2007 and was referred to the ENT clinic in April, and that what happened at other units was outside of the control of the Beto Unit.

Fenlon filed a Step Two grievance saying that the Step One response was "deceptive" and that even though he had a request for an urgent referral to Galveston when he arrived, the referral was not actually done until some 60 days later.  He says that the Beto Unit is not a separate entity

21

and that his grievance was to TDCJ, not the Beto Unit, and so the response shows that the grievance procedure is a sham. He complains about the failure to diagnose the abdominal aneurysm despite his complaints about a "pulsing lump" in his stomach, and says that he had two major surgeries (for the aneurysm and the lump in his neck) nine days apart. He complains that he is receiving no dental care at the Estelle Unit, and that his detention at Estelle is a serious impediment to his receiving medical treatment. Fenlon says that it is "not rational" to believe that he was simply mis-diagnosed; rather, he says, it is "deliberate indifference and criminal negligence with malicious intent." The response to this grievance was that his condition was followed by each unit he listed in his complaint, that he is currently under the care of the specialty clinic, and that he is undergoing treatment from medical providers at the unit as well as specialists for his condition.

Legal Standards and Analysis

The issue at the heart of Fenlon's complaint is the fact that the squamous cell carcinoma on his neck went undiagnosed for five years. There is not any question or doubt that this was a terrible tragedy. The issue before the Court is whether a constitutional violation occurred.

The Fifth Circuit has held that deliberate indifference to a convicted inmate's serious medical needs could state a civil rights violation, but a showing of nothing more than negligence does not. Norton v. Dimazana, 122 F.3d 286, 291 (5th Cir. 1997); Jackson v. Cain, 864 F.2d 1235, 1246 (5th Cir. 1989). However, simple disagreement with the medical treatment received or a complaint that the treatment received has been unsuccessful is insufficient to set forth a constitutional violation. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985); Norton, 122 F.3d at 293.

Furthermore, malpractice alone is not grounds for a constitutional claim. Varnado v. Collins, 920 F.2d 320, 321 (5th Cir. 1991). Negligent or mistaken medical treatment or judgment does not implicate the Eighth Amendment and does not provide the basis for a civil rights action. Graves v. Hampton, 1 F.3d 315, 319-20 (5th Cir. 1993). The Fifth Circuit has held that the fact that medical care given is not the best that money can buy, and the fact that a dose of medication may occasionally

22

be forgotten, does not amount to deliberate indifference to serious medical needs.  Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992).

More pertinently, the Fifth Circuit has held that an inmate who had been examined by medical personnel on numerous occasions failed to set forth a valid showing of deliberate indifference to serious medical needs.  Spears v. McCotter, 766 F.2d 179, 181 (5th Cir. 1985).  It should be noted in this regard that medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs.  Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995).

In Domino v. TDCJ-ID, 239 F.3d 752 (5th Cir. 2001), a inmate who was a psychiatric patient expressed suicidal ideations and the psychiatrist returned him to his cell after a five-minute examination; the inmate committed suicide two and a half hours later.  The Fifth Circuit, in reversing a denial of summary judgment by the district court, stated as follows:

> Deliberate indifference is an extremely high standard to meet.  It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference.  Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985).  Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."  Id.  Furthermore, the decision whether to provide additional medical treatment "is a classic example of a matter for medical judgment."  Estelle v. Gamble, 429 U.S. 97, 107 (1972).  And, "the failure to alleviate a significant risk that [the official] should have perceived, but did not," is insufficient to show deliberate indifference.  Farmer v. Brennan, 511 U.S. 825, 838 (1994).

Domino, 239 F.3d at 756.

The Fifth Circuit's decision in Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999), presents an illuminating picture of what does and does not constitute deliberate indifference to serious medical needs.  In that case, the plaintiff Eugene Stewart was incarcerated in May of 1993, at which time he was 67 years old and suffering from numerous ailments, including hypertension, arthritis, gout, and heart disease.  In August of 1994, he was admitted to the hospital for treatment of swollen legs, a possible indication of congestive heart failure.  He was treated for five days and then released, but the next day, the treating physician, Dr. Dial, was notified that Stewart had a large

decubitus ulcer (i.e. a bedsore) on his back.  He ordered cleansing of the ulcer, treatment with antibiotics, and placement on the sick call list; however, it was not clear why such a wound was not discovered during Stewart's stay in the hospital, rather than after his discharge.

Stewart was readmitted to the prison hospital on September 6, 1994, this time under the care of Dr. Kim.  She took cultures from the ulcer, debrided the wounds, and administered antibiotics and IV fluids.  Dr. Kim also ordered that the dressings be changed three times a day and that Stewart be repositioned every three hours, but acknowledged that due to staffing problems, the nurses sometimes did not carry out the doctor's orders.

Stewart's ulcers did not improved and he was transferred to a non-prison hospital for consultation and treatment.  When he returned, Dr. Kim did not follow the free-world physician's advice to transfer Stewart to another facility for physical therapy.  Instead, Dr. Kim ordered that Stewart be kept out of bed as much as possible and that the nurses move his extremities.  She also transferred him to the care of another physician, Dr. Knutson.

Dr. Knutson treated Stewart's ulcers with medication, ordered that the dressings be changed twice a day, and that Stewart be repositioned every hour.  He also checked the wounds periodically and ordered that Stewart get out of bed for extended periods of time.

However, Dr. Knutson conceded that he often did not read the nurses' notes, which said that Stewart had an infection from a catheter, and did not prescribe antibiotics.  He did not see Stewart over the Thanksgiving four-day weekend, and saw him next on November 28, 1994, at which time Stewart appeared like he was going to die.  Dr. Knutson tried to treat Stewart at the prison hospital but ultimately transferred him to the University of Mississippi Medical Center, where the attending physician stated that Stewart had "the worst bedsores she had ever seen."  Stewart died on December 7, 1994.

Stewart's family sued Drs. Dial, Kim, Knutson, and Russell, the medical director at the prison facility.  The district court granted summary judgment for the physicians, and an appeal was taken.

On appeal, the Fifth Circuit affirmed the grant of summary judgment.  The Fifth Circuit concluded that there was no probative evidence that any of the doctors denied, substantially delayed, or intentionally interfered with treatment.

The dissenting opinion argued that Stewart had not received even rudimentary medical care. The dissent asserts that Dr. Dial was told the day after Stewart was discharged from hospital in August of 1994 that he had developed a 25-centimeter (10-inch) stage IV decubitus ulcer, which Dial apparently had not noticed in five days of treating him.  Dr. Dial prescribed a regimen of cleansing, dressing, and antibiotics, but never checked to see if his orders were being carried out or if they were effective.  Nor did Dr. Dial review the nurses' notes.

According to the dissent, Dr. Kim found that Stewart had developed multiple decubitus ulcers including a "very deep infection," and gave orders for their treatment.  However, the dissent contended that Dr. Kim knew full well that the facility was too understaffed to carry out her orders, but made no effort to carry out a recommendation that Stewart be transferred to a facility where he could receive proper treatment.  Finally, the dissent said that the nurses charted numerous symptoms of infection, but Dr. Knutson did not review these notes; although Dr. Knutson observed after Thanksgiving that Stewart had a urinary tract infection, he did not prescribe any antibiotics. Nonetheless, the dissent did not carry the day; the majority concluded that the doctors had provided "active treatment" for Stewart's ailment and that there was no material fact issue to support the requisite deliberate indifference necessary for liability.

In Fenlon's case, as noted above, the central focus of his complaint lies in the five-year delay in diagnosing the squamous cell carcinoma.  The vast majority of this time period was spent at the Garza West Unit, in Bee County, and the Ramsey Unit, in Brazoria County.  Both of these units are outside of the Eastern District of Texas and therefore out of the territorial jurisdiction of this Court, and so the Court will focus on Fenlon's claims arising after his transfer to the Beto Unit.

The medical records reflect that Fenlon came to the Beto Unit on or around March 7, 2007. He was seen by a nurse, who referred him to a medical provider, and he then saw a physician's

assistant named Cheryl Egan.  The medical records reflect that she ordered X-rays and a complete blood count, and referred him to the ENT clinic in Galveston; he was transported to Galveston in June, where the cancer was diagnosed.

Even taking as true Fenlon's assertion that Egan would not prescribe him antibiotics or pain medication when she saw him in April, it is clear that Egan was not deliberately indifferent to his medical needs.  His disagreement with her assessment that those medications were not needed does not show a constitutional violation.  Indeed, other than not ordering the medications which Fenlon thought appropriate, the records show that Egan was quite responsive to his condition; she ordered that tests be done and put him in for a referral to Galveston which was done in June, thus accomplishing in two months what Fenlon says had not been done in the preceding five years.

At the evidentiary hearing, Fenlon argued that his complaint concerned the policies and procedures of TDCJ itself.  His complaint and grievances set out his belief that even where the doctors wished to help him, they were circumvented by these policies and procedures.  It is for this reason, he said, that he sued the Director of TDCJ and the chief of UTMB.

The Fifth Circuit has stated that lawsuits against supervisory personnel based on their positions of authority are claims of liability under the doctrine of *respondeat superior*, which does not generally apply in Section 1983 cases.  Williams v. Luna, 909 F.2d 121, 122 (5th Cir. 1990).  A supervisor may be held liable if there is personal involvement in a constitutional deprivation, a causal connection between the supervisor's wrongful conduct and a constitutional deprivation, or if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force behind a constitutional deprivation.  Thompkins v. Belt, 828 F.2d 298, 304 (5th Cir. 1987).  It is under this final clause that Fenlon bases much of his lawsuit.

In reviewing Fenlon's claims in this regard, the Court notes that a "systemic maladministration of the laws" or "permanent, well-settled practices" can constitute a "custom or usage" which is the equivalent of a policy.  Thompkins, 828 F.2d at 304 n.8, *citing* Bennett v. City of Slidell, 728 F.2d 762, 768 (5th Cir. 1984) (*en banc*).  The law is also clear that isolated violations

26

are not the persistent, often repeated, constant violations which constitute custom and policy. Bennett. 728 F.2d at 768.

While Fenlon argues that the delays in sending him to Galveston were the result of a custom or policy, he has failed to identify any custom, policy, or practice which unconstitutionally mandated delays in treatment.  Certainly this was not the case at the Beto Unit, where he was seen by the provider in April and was sent to Galveston in June.  Although Fenlon complains about this two-month delay, it is not unconstitutionally unreasonable, particularly in light of the large numbers of inmates with whom the system must deal.  Even in the free world there is a waiting time between a referral from a physician and a visit to a specialist, particularly in a managed care setting such as TDCJ uses.  *See, e.g.*, Beasley v. Natchitoches Parish Detention Center, slip op. no. 07-CV-0602 (W.D.La., July 11, 2007) (unpublished) (available on WESTLAW at 2007 WL 2437067).   In Beasley, the plaintiff suffered a broken collarbone in February of 2007, and had not received physical therapy by April, although he did see a doctor on March 27 who ordered pain medication, muscle relaxants, X-rays, and physical therapy.  On April 17 and April 30, 2007, he was made to go outside for recreation although he had not yet received his muscle relaxer or pain medication, and on April 23, he filed a document saying that his pain medication had been "suspended," and a nurse told him that the pain medication had only been prescribed for a limited time.  The district court observed that a delay of 26 days before seeing a medical specialist does not amount to a deprivation of rights, and that it is not uncommon for those not incarcerated to wait for substantially longer periods of time for specialized medical treatment.

In this case, it is true that Fenlon had a more serious condition than a broken collarbone, and that his wait was longer than 26 days; however, Egan did not realize that the lump on his throat was malignant when she saw him, because the cancer had not yet been diagnosed.  The fact that he had to wait from April until June to go to Galveston does not show that a constitutional violation occurred, nor is it indicative of an unconstitutional policy, custom, or practice.  Fenlon's claim on this point is without merit.

Fenlon also argues that the Director of TDCJ has "approved funding cutbacks" and that he has read newspaper articles in which TDCJ officials are quoted as saying that the reductions in the medical budget will result in an increase in legal actions and legal expenses defending lawsuits for inadequate medical care.  He says that Quarterman knew or should have known that he was approving funding reductions that were deliberately indifferent to the medical needs of prisoners, and that underfunding would result in medical care that was constitutionally inadequate.

In 2004, the estimated money spent for correctional managed health care (not including psychiatric care) was $295,511,641, and the budgeted amount for 2005 was $299,774,719.  The budget request for 2006 was $333,509,512, and the request for 2007 was $340,526,094.  The estimated money spent in 2006 was $332,656,231, and the budgeted amount for 2007 was $332,656,232.  The total budget request for 2008 was $391,989,903, and the request for 2009 was $395,389,326.  *See* Fiscal Year 2007 Operating Budget and Fiscal Years 2008-9 Legislative Appropriations Request, and Fiscal Year 2005 Operating Budget and Fiscal Years 2006-7 Legislative Appropriations Request, available online at http://www.tdcj.state.tx.us/publications/ publications-home.htm.

These numbers show that there have been no budget "cuts" per se, although the amounts allocated by the Legislature have been below the amounts requested by TDCJ officials.  He has not shown that Quarterman or the medical director of UTMB have "approved funding reductions," nor that any such reductions have occurred, much less that these supposed reductions were deliberately indifferent to the needs of prisoners.  Fenlon's claim that TDCJ has a "policy" of underfunding medical care for prisoners is without merit.

Fenlon next complains about policies surrounding the transportation of prisoners to Galveston.  He states that the bus rides are often hot and uncomfortable, the vans have poor suspensions and so the inmates are "bounced around." He also complains that during layovers, prisoners are deprived of sleep.

28

Indicia of confinement constituting cruel and unusual punishment include wanton and unnecessary infliction of pain, conditions grossly disproportionate to the severity of the crime warranting imprisonment, and the deprivation of the minimal civilized measures of life's necessities. Wilson v. Lynaugh, 878 F.2d 846, 848 (5th Cir.), *cert. denied* 493 U.S. 969 (1989).  The Supreme Court has held, however, that to the extent that prison conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.  Rhodes v. Chapman, 452 U.S. 337, 346-7 (1981).

The Rhodes Court held that any Eighth Amendment analysis must look to the evolving standards of decency that mark the progress of a maturing society, but cautioned that the standards are derived from objective factors.  Rhodes, 452 U.S. at 346.

In compliance with the Supreme Court's opinion, the Fifth Circuit has stated that the Eighth Amendment does not afford protection against mere discomfort or inconvenience.  Wilson, 878 F.2d at 849.

In this case, Fenlon's complaints concerning transportation are essentially claims about "mere discomfort or inconvenience," and thus not of constitutional dimensions.  Galveston is over 220 miles from Tennessee Colony, and certain discomforts necessarily attach to a trip of that distance in a bus.  Fenlon's complaints about the suspension and the air conditioning do not rise to constitutional dimensions, nor has he shown that TDCJ has a custom, policy, or practice of using the transportation procedure as a means of torture, as he claims.  His assertion that the Supreme Court has held that depriving inmates of eight hours of uninterrupted sleep is cruel and unusual punishment is pure fancy.  The fact that Fenlon may get only three to five hours of sleep during an overnight stay at a different unit while en route to the hospital in Galveston does not amount to a constitutional violation, particularly where no harm has been shown as a result of these occasional deprivations. *See, e.g.*, Atkinson v. Johnson, 74 Fed.Appx. 365 (5th Cir., August 26, 2003) (not selected for publication in the Federal Reporter); Chavarria v. Stacks, 102 Fed.Appx. 433 (5th Cir., July 20,

2004) (not selected for publication in the Federal Reporter) (policy of constant illumination in the administrative segregation area, leading to interference with sleep, did not violate the Constitution).[4]

In a related claim, Fenlon complains about a "policy" of not providing medications to inmates at night.  He points to occasions at the Byrd Unit where he arrived in the evening with medication orders, but was not able to get medications until the next morning, and says that TDCJ has a "policy" of not providing medication at night.

The Byrd Unit, like Garza West and Ramsey, is outside of the territorial jurisdiction of the Eastern District of Texas.  In addition, Fenlon has not shown that these delays in providing medication, amounting to no more than a matter of hours, amounted to a constitutional violation, nor that he suffered constitutionally significant harm as a result.  *See, e.g.*, Mayweather v. Foti, 958 F.2d at 91.  As a result, his claim of an unconstitutional policy regarding the providing of medications at night is without merit.  *See also* Haddix v. Kerss, 203 Fed.Appx. 551 (5th Cir., October 9, 2006) (not selected for publication in the Federal Reporter) (occasional denial of pain medication, resulting in unrelieved back and shoulder pain, did not set out a constitutional claim).

Fenlon next complains about TDCJ's formulary policies.  He says that there is a "very limited" list of medications that doctors can prescribe, which are usually those which have been around for a long time and are cheap, and that doctors are required to prescribe these to "see if they work," even if the doctor knows that the medications will not work and that there are newer medications which can cure the patient.  Fenlon does not state how he knows the extent of the TDCJ formulary list, nor how he knows that a doctor prescribing medication would know that it will not work.  Instead, he says that what happens is that prisoners come in with infections or conditions which must be treated by medications on the approved list, but the doctor must try medications which are on the approved list which he knows will be inadequate.  Sometimes, he says, the doctor

---

[4]In Gates v. Cook, 376 F.3d 323, 340 (5th Cir. 2004), a constant infestation by mosquitos and other insects caused chronic sleep deprivation, exacerbating the mental illness problems suffered by the inmates in the area, and an injunction to correct these conditions was affirmed by the Fifth Circuit.  That fact pattern is clearly a far cry from the claims presented by Fenlon in this case.

must prescribe several different medications, knowing that these will not work and knowing that there is a newer medication which would work, but that the doctor cannot prescribe this new medication because it is not on the approved list.  Eventually, the prisoner's condition worsens to the point that he is sent to Galveston, where he does get the proper medication, but suffers permanent harm or disfigurement from the delay.

Fenlon does not show that he had an ailment which could have been cured by a medication not on the formulary list, but that a doctor knew this and prescribed him something on the list anyway.  On the contrary, the medical records show that Fenlon was prescribed a medication which was not on the formulary list - Tylenol 3 in elixir form - and the medical staff made a special request to obtain it for him.  Although Fenlon complains of this alleged "policy," he has failed to show that he personally was affected by it, even assuming that such a policy exists.  *See* Coon v. Ledbetter, 780 F.2d 1158, 1159 (5th Cir. 1986) (persons claiming a deprivation of constitutional rights are required to show a deprivation of their personal rights).  His claim on this point is without merit.

Fenlon also contends that his medications were changed by physicians who did not examine him.  TDCJ does have a medical policy which provides that the doctors at Galveston simply make recommendations, but that the final determination is made by the medical providers on the units.  Fenlon has not shown that this policy is itself unconstitutional, nor that it was the moving force behind a constitutional violation.  The fact that he considered the treatment recommended by the doctors in Galveston preferable to that ordered by the medical providers on the unit does not form the basis of a constitutional claim.  Johnson v. Treen, 759 F.2d at 1238.

Fenlon also raises complaints concerning the dental care which he has received.  As above, many of his complaints occurred during the period when he was confined at the Garza West and Ramsey Units, which are outside of the territorial jurisdiction of the Eastern District of Texas.  As noted above, the dental records show that he is now receiving dental care.  While there do appear to have been delays in the past with obtaining dental care, the records show that this was in part attributable to the state of Fenlon's teeth when he went to see the dentist.  In addition, there have

been delays due to the fact that Fenlon has often been in transport to Galveston for treatment of other conditions.  Fenlon has not shown that prison officials have been deliberately indifferent to his dental needs, nor that unconstitutional policies have been the moving force behind a constitutional violation in this regard.  His claim on this point is without merit.

Fenlon complains of a "policy" which in effect gives inmates only seven or eight minutes to eat.  He says that they are supposed to receive 20 minutes, but that this time starts when they enter the dining *hall*, not the dining *room*; thus, the time spent waiting in line is counted as part of the 20 minutes.

The Fifth Circuit has held that inmates have a constitutional right to receive reasonably adequate food.  George v. King, 837 F.2d 705 (5th Cir. 1987).  This does not mean that the meals must be hot, and the fact that the food may be "unappetizing or unattractive" does not amount to a constitutional violation.  Hoitt v. Vitek, 497 F.2d 598 (1st Cir. 1974); LeMaire v. Maass, 12 F.3d 1444, 1456 (9th Cir. 1993), *citing* Hamm v. DeKalb County, 774 F.2d 1567, 1575 (11th Cir. 1985), *cert. denied* 475 U.S. 1096 (1986).  A deprivation of one or two meals is not cruel or unusual punishment, nor is the deprivation of 50 meals over a period of five months a constitutional violation.  Talib v. Gilley, 138 F.3d 211, 214 (5th Cir. 1998); Moss v. Ward, 450 F.Supp. 591, 596 (W.D.N.Y. 1978).  Fenlon has failed to show that the policy, or the implementation of the policy, was unconstitutional, nor that it was the moving force behind a constitutional deprivation.  His claim on this point is without merit.

Fenlon also complains of denial of access to court in various particulars.  As a general rule, inmates have no right of access to copy paper or reproduction equipment.  Beck v. Lynaugh, 842 F.2d 759, 762 (5th Cir. 1988). He says in this case that the denial of copies prevented him from filing a cert petition with the U.S. Supreme Court regarding his federal habeas corpus action.  Fenlon does not indicate when this happened.

Court records show that Fenlon has filed three habeas corpus petitions in federal court.  The first of these was styled Fenlon v. Thomas, civil action no. 4:00cv1342 (S.D.Tex.).  This petition was

32

denied without prejudice on March 5, 2001, for failure to exhaust state remedies.  Fenlon sought certiorari with respect to the Fifth Circuit's affirmance of this decision, and cert was denied on May 27. 2003.  Fenlon v. Thomas, 538 U.S. 1059 (2003) (Mem).

Fenlon's second habeas petition was styled Fenlon v. Thomas, civil action no. 4:00cv4177 (S.D.Tex.).  This petition was dismissed without prejudice for failure to exhaust state remedies on December 7, 2000.  Fenlon appealed this decision to the Fifth Circuit, which denied his application for certificate of appealability on July 6, 2001.

Fenlon's third state habeas petition was styled Fenlon v. Dretke, civil action no. 4:04cv1541 (S.D.Tex.).  This petition also was dismissed without prejudice for failure to exhaust state remedies - Fenlon raised 17 grounds of error, of which ground no. 15 had 15 sub-parts, no. 16 had 35 sub-parts, and no. 17 had 24 sub-parts, and the district court concluded that Fenlon had not presented all of these grounds for relief to the state courts.  Fenlon filed a notice of appeal, and this appeal is still pending before the Fifth Circuit.

Fenlon has also sought a writ of certiorari against the First Judicial District Court of Appeals in Houston, which was denied on January 12, 2004.  Fenlon v. Texas, 540 U.S. 1115 (2004) (Mem). He sought a writ of certiorari in a civil lawsuit asserting that his attorneys conspired with the judge and prosecutor to fabricate evidence against him, which cert petition was denied on January 20, 2004.  Fenlon v. Moskowitz, 540 U.S. 1153 (2004) (Mem).  Fenlon has also sought a writ of certiorari against the Fifth Circuit in a case styled Fenlon v. United States District Court for the Southern District of Texas, which was a mandamus proceeding in which he asked that the district court be ordered to compel the Attorney General to file an answer containing "a specific response to each factual and legal contention with applicable authority."  He also asked that the district court be directed to rule on his motions for sanctions and that the Attorney General be held in contempt. His request for mandamus relief was denied by the Fifth Circuit, and Fenlon's cert petition to the Supreme Court was denied as well. Fenlon v. U.S. District Court for the Southern District of Texas, 126 S.Ct. 2917 (2006) (Mem).

In the present case, Fenlon says that he was denied access to the Supreme Court because he did not have access to copy machines, and the clerk of the Court would not accept his handwritten copies.  His allegations make clear that he did have originals, since he made handwritten copies; he does not explain why he sent his handwritten copies to the Supreme Court, rather than sending the originals and keeping the handwritten copies for himself.  Hence, the fact that he could not get copies made of his originals did not deprive him of access to court.

In addition, Fenlon has failed to show that his petition for writ of certiorari would have raised a non-frivolous issue.  In <u>Phillips v. Walker</u>, 122 Fed.Appx. 120 (5th Cir., February 10, 2005) (not selected for publication in the Federal Reporter), the plaintiff Desmond Phillips complained of the destruction of a box of legal papers, saying that he was denied access to court because the destruction of these papers prevented him from meeting the deadline to file a petition for a writ of certiorari with the U.S. Supreme Court.  The Fifth Circuit stated that "because Phillips has not shown that he would have raised a non-frivolous issue if he had been able to file a timely petition for writ of certiorari, he has not established actual injury."  The Court cited <u>Lewis v. Casey</u>, 518 U.S. 343,  351-52 and 355, 116 S.Ct. 2174, 2180-82 (1996) and <u>Ruiz v. United States</u>, 160 F.3d 273, 275 (5th Cir. 1998) in rendering this holding.

In the same way, Fenlon has not shown that he suffered any harm as a result of not being able to file a cert petition with the Supreme Court, because he has not shown that such a petition would have raised non-frivolous issues.  His claim of denial of access to court in this regard is without merit.

Fenlon also complains that he has been denied adequate time in the law library.  The Supreme Court has stated that inmates have a right of access to legal materials, and prison officials cannot deny inmates access to court.  <u>Bounds v. Smith</u>, 430 U.S. 817 (1976).  However, actual injury must be shown to set out a violation of <u>Bounds</u>.  <u>Lewis v. Casey</u>, 116 S.Ct. at 2179-81 (1996) (actual harm must be shown to establish a violation of the right of access to court); *accord*, <u>Mann v. Smith</u>, 796 F.2d 79, 83 (5th Cir. 1986).

The Supreme Court has held that <u>Bounds</u> does not "guarantee inmates the wherewithal to transform themselves into litigating engines." <u>Lewis</u>, 116 S.Ct. at 2182.  In <u>Lewis</u>, as noted above, the Court reaffirmed the longstanding requirement that inmates claiming a violation of <u>Bounds</u> must show actual injury.  <u>Lewis</u>, 116 S.Ct. at 2180.  The Court provided the following examples of "actual injury" under <u>Bounds</u>:

> [The inmate] might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known.  Or that he had suffered some arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint.

<u>Lewis</u>, 116 S.Ct. at 2180.

In this case, Fenlon has not shown that he suffered any actual injury as a result of being denied adequate law library time.  He presented and filed an extensive and detailed complaint in this case, following this with an even more extensive response to a questionnaire.  His lawsuit was not dismissed on a technicality, and he has not shown any difficulty in filing actions in state or federal court; Fenlon has sought certiorari from the U.S. Supreme Court in four separate cases, he has filed some 19 appeals with the Fifth Circuit Court of Appeals (including multiple interlocutory appeals), he has filed two *pro se* appeals in the intermediate appellate courts of the State of Texas as well as three state habeas corpus petitions, and he has filed three federal habeas corpus petitions and three civil rights actions in federal district court.  Fenlon's contention that he has been denied access to court is plainly without merit.  *See* <u>Mann</u>, 796 F.2d at 84 (noting that the plaintiff "proved in an irrefutable manner that he was able to file a legally sufficient complaint: by doing so").

Fenlon further complains about the grievance procedure.  He says that the grievance form allows only one page for prisoners to set out their complaints, that prisoners are only allowed one grievance every seven days, which is enforced in such a way as to make it difficult to submit as many as three grievances a month, that grievances may only raise one issue and that prison officials often define the issue to which they choose to respond very narrowly, ignoring the actual thrust of the grievance, and that most responses to grievances are "boilerplate, vague, and unresponsive."

The Fifth Circuit has held that inmates do not have a constitutionally protected liberty interest in having grievances resolved to their satisfaction, and so there is no violation of due process when prison officials fail to do so.  Geiger v. Jowers, 404 F.3d 371, 373-74 (5th Cir. 2005).  Along the same lines, the Court has stated that a prisoner's claim that a defendant "failed to investigate and denied his grievance" raises no constitutional issue.  Edmond v. Martin, et al., slip op. no. 95-60666 (5th Cir., Oct. 2, 1996) (unpublished); Thomas v. Lensing, et al., slip op. no. 01-30658 (5th Cir., Dec. 11, 2001) (unpublished) (same).  A number of other courts have held that inmate grievance procedures are not constitutionally required, and so violations of such procedures do not deprive inmates of constitutionally protected rights.  Spencer v. Moore, 638 F.Supp. 315, 316 (E.D. Mo. 1986), citing O'Bryan v. County of Saginaw, 437 F.Supp. 582 (E.D. Mich. 1977); see also Azeez v. DeRobertis, 568 F.Supp. 8 (N.D. Ill. 1982).  In Mann v. Adams, 855 F.2d 639, 641 (9th Cir.), cert. denied 109 S.Ct. 242 (1988), the Ninth Circuit Court of Appeals noted that inmates have no legitimate claim of entitlement to a grievance procedure, and thus no protected liberty interest exists.  This position was also taken by the Eighth Circuit in Flick v. Alba, 932 F.2d 728, 730 (8th Cir. 1991).  Fenlon has failed to show a constitutional violation with respect to his claims concerning the grievance procedure, and these claims are therefore without merit.

Fenlon complains that because of delays in getting notary service, inmates have to wait up to 72 hours before they can get an inmate trust account statement for applications for leave to proceed in forma pauperis.  He has not shown that he suffered any harm as a result of this delay, nor any reason why an inmate in this situation could not simply ask for the statement a few days before his complaint is finished and ready to send to the court.  This contention fails to show a constitutional deprivation.  Similarly, he complains that when he arrived at the Beto Unit, he received information saying that complaints about medical care could be raised with the patient liaison department, when in fact this department was no longer accepting complaints.  This also does not show a violation of the Constitution of the United States.

Finally, Fenlon's complaint may be read to raise a retaliation claim.  The Fifth Circuit has held that the elements of a claim under a theory of retaliation are the invocation of a specific constitutional right, the defendant's intent to retaliate against the plaintiff for his exercise of that right, a retaliatory adverse act, and causation, which is a showing that but for the retaliatory motive, the action complained of would not have occurred.  Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997).  This requirement places a heavy burden upon inmates, because mere conclusionary allegations will not suffice; instead, the inmate must produce direct evidence of retaliation or, the more probable scenario, a chronology of events from which retaliation may plausibly be inferred.  Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995).  The relevant showing must be more than the prisoner's personal belief that he is the victim of retaliation.  Johnson, 110 F.3d at 310, *citing* Woods v. Edwards, 51 F.3d 577, 580 (5th Cir. 1995).

In this case, to the extent that Fenlon seeks to raise a retaliation claim, he has not shown either intent to retaliate against him for the exercise of constitutional rights, nor has he made a showing that but for the retaliatory motive, the adverse actions would not have occurred.  Consequently, any retaliation claim which Fenlon may raise in his complaint is without merit.

Conclusion

28 U.S.C. §1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees.  Section 1915A(b) requires that upon review, the court shall identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

The term "frivolous" means that a complaint lacks an arguable basis in law or fact; a complaint is legally frivolous when it is based upon an indisputably meritless legal theory.  Neitzke v. Williams, 490 U.S. 319, 325-7 (1989).  A complaint fails to state a claim upon which relief may be granted if as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.  Neitzke v. Williams, 490 U.S. 319, 327, (1989),

37

*citing* <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984); *see also* <u>Blackburn v. City of Marshall</u>, 42 F.3d 925, 931 (5th Cir. 1995).

In this case, Fenlon's complaint lacks any arguable basis in law and fails to state a claim upon which relief may be granted.  Consequently, his lawsuit may be dismissed as frivolous under 28 U.S.C. §1915A(b).  *See generally* <u>Thompson v. Patteson</u>, 985 F.2d 202 (5th Cir. 1993).  It is accordingly

ORDERED that the above-styled civil action be and hereby is DISMISSED with prejudice as frivolous.  28 U.S.C. §1915A.  It is further

ORDERED that any and all motions which may be pending in this civil action are hereby DENIED.

So **ORDERED** and **SIGNED** this **5**   day of  **March, 2008.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE

38